UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TREACE MEDICAL CONCEPTS, INC.,
a Delaware corporation,

    Plaintiff,

v.                                              Case No.

SERGIO URQUIZA, an individual,

    Defendant.
_____/

# COMPLAINT
### (Permanent Injunctive Relief Requested/Demand for a Jury Trial)

Treace Medical Concepts, Inc. ("Treace"), through undersigned counsel, hereby sues Defendant Sergio Urquiza ("Urquiza") and alleges as follows:

### Parties

1. Treace is a Delaware corporation. Treace's principal office address is 100 Palmetto Park Place, Ponte Vedra, Florida 32081.

2. Urquiza is an individual who is a resident of Illinois.

3. Urquiza is the sole manager/member of Crimson Biomed LLC ("Crimson Biomed").

### Jurisdiction and Venue

4. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332.

{00412143 1 }

5. This action is between citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. If Urquiza is not enjoined from violating the restrictive covenants outlined herein, Treace will suffer damages well in excess of $75,000 as a result of lost business and misappropriation of its confidential information. Moreover, Treace reasonably anticipates that it will incur in excess of $75,000 in attorneys' fees and costs to enforce its rights against Urquiza in this action, the recovery of which is provided for pursuant to section 542.335, Florida Statutes.

6. This Court has personal jurisdiction over Urquiza because he contractually agreed that any legal proceeding arising out the Independent Sales Agent Agreement ("Agreement"), which was entered into between Treace, Crimson Biomed, and Urquiza, shall be brought in a court of competent jurisdiction in Duval County, Florida. A copy of the Agreement is attached hereto as **Exhibit A**. The forum selection clause is found under Section 20 of the Agreement. The sole claim alleged herein is based on Urquiza's breach of the Agreement's restrictive covenants.

7. Venue is proper in this Court for the same reason. Pursuant to Section 20 of the Agreement, any legal proceeding arising out the Agreement must be brought in a court of competent jurisdiction in Duval County, Florida.

### Factual Allegations

8. Treace is a commercial-stage orthopaedic medical device and technology company with the goal of advancing the standard of care for the surgical management of bunion deformities and related midfoot correction.

9. Bunions are complex 3-dimensional deformities that originate from an unstable joint in the middle of the foot. Treace has pioneered and patented the Lapiplasty® 3D Bunion Correction™ ("Lapiplasty® procedure") – a combination of instruments, implants, and surgical methods designed to correct all 3 planes of the bunion deformity and secure the unstable joint, addressing the root cause of the bunion and helping patients get back to their active lifestyles. Treace recently expanded its offering with the Adductoplasty™ Midfoot Correction System, designed for reproducible correction of the midfoot which could provide further support to hallux valgus patients.

10. Treace's Lapiplasty® mark was registered on January 3, 2017 on the USPTO's principal register as U.S. Registration No. 5,115,724. On April 5, 2021, Treace filed for registration of its 3D Bunion Correction™ mark in International Class 044 for "providing a website featuring information in the field of bunions and bunion surgery."

11. Bunions often progress to the point of requiring surgical intervention. For decades, traditional bunion surgery produced mixed results. With traditional bunion surgery techniques, the relevant bones of the foot were cut, reshaped and the cosmetic bump addressed. These traditional techniques, however, did not restore the foot's natural biomechanical structure.

12. In 2015, Treace introduced surgeons to a better way to surgically treat bunions. Treace's novel methods led to greatly improved patient outcomes and caused a paradigm shift in the way surgeons performed bunion surgery. Treace's patented

surgical methods seek to restore the natural biomechanical structure of the foot by restoring the tri-planar alignment of the patient's big toe, or more specifically, the relative orientation of the medial cuneiform and first metatarsal bones and the cuneiform-metatarsal joint. Treace's procedure typically allows patients to bear weight in a surgical boot within days of the surgery.

13. Treace's Lapiplasty® procedure has received extensive industry praise. As a result, surgeons have increasingly chosen to change the way they treat bunions, moving away from traditional surgical methods to Treace's Lapiplasty® procedure.

14. Treace markets and sells its products throughout the United States. The market for surgical bunion products such as Treace's Lapiplasty® procedure is extremely competitive.

15. Treace has spent considerable amounts of money educating surgeons about the benefits of the Lapiplasty® procedure over traditional bunion surgery and on training surgeons in how to correctly perform the Lapiplasty® procedure. Treace sponsors cadaver labs and other educational seminars where surgeons can learn from and practice Lapiplasty® procedure with experienced Lapiplasty® procedure surgeons before they perform this surgery on their own.

16. As part of its commercial strategy, Treace has a sales force comprised of sales representatives and clinical specialists who are direct employees.

17. Treace also utilizes independent sales agents for purposes of marketing and selling its products to its customers. These customers include of hospital systems, medical practices, and surgeons who trial, use, and implant Treace's medical devices.

Treace enters into agreements with these independent sales agents, whereby the independent sales agents agree to serve as Treace's exclusive sales agent for the promotion of, and solicitation of orders for, Treace's products in a particular geographic territory in exchange for the payment of a commission for sales made by the independent sales agent.

18. Treace provides extensive training to its independent sales agents on its products. Treace also provides its independent sales agents with promotional and sales literature relating to its products, sales leads, and other educational and marketing training and activities to generate customer interest in Treace's products.

19. Treace provides its independent sales agents with certain confidential and/or proprietary information related to Treace's products and processes. This includes information related to Treace's products or business, including, but not limited to, customer lists, books, marketing strategies, medical education presentations, surgical techniques, financial information, records, literature, products, papers, documents, writings, samples, and other property.

20. Treace relies on its independent sales agents to promote and sell Treace's products to Treace's target customers. Treace's independent sales agents are expected to identify and develop substantial relationships with specific prospective and existing customers within their designated geographic territory. Treace's independent sales agents also educate surgeons on the use of Treace's products.

21. Treace entered into an independent sales agent agreement, the Agreement, with Crimson Biomed and Urquiza on January 19, 2021. Urquiza signed

the Agreement as a guarantor in full of Crimson Biomed's obligations to Treace under the Agreement.[1]

22. Pursuant to the Agreement, Crimson Biomed agreed to serve as Treace's exclusive independent sales agent in eastern Iowa. Crimson Biomed's territory was specifically designated by area codes in the Agreement.

23. As part of his training as an independent sales agent, Urquiza received Certified Lapiplasty® Specialist Training, which is an advanced training course. Further, Urquiza attended and participated in numerous national, regional and local seminars, advanced training labs, symposia and cadaveric training events during his relationship with Treace.

24. Crimson Biomed and Urquiza routinely had direct contact with Treace's existing and specific prospective customers within the designated territory under the Agreement. Crimson Biomed and Urquiza developed substantial relationships with these existing and prospective customers as the exclusive sales agent of Treace and served as Treace's primary point of contact with Treace's customers in the territory defined under the Agreement.

25. Crimson Biomed and Urquiza were provided access to Treace's proprietary and confidential information related to Treace's products and business, including, but not limited to, customer lists, books, marketing strategies, medical

---

[1] Urquiza also briefly worked as a Treace independent sales agent starting in June 2020. Urquiza terminated the independent sales agent agreement in 2020 was hired by Treace as an employee in 2020. Urquiza worked as a Treace employee from December 7, 2020, through December 31, 2020, as an Area Sales Manager in the San Diego area.

education presentations, surgical techniques, financial information, records, literature, products, papers, documents, writings, samples, pricing information, training, patient outreach strategies, and other property of Treace. This information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and is the subject of efforts by Treace that are reasonable under the circumstances to maintain its secrecy.

26. The Agreement contains various restrictive covenants intended for the protection of Treace.

27. Section 11 of the Agreement addresses Treace's confidential information. Section 11 provides:

> 11.1. ISA shall not, except as otherwise expressly authorized in writing by TMC, use or disclose to any person (including without limitation ISA's Associates, representatives, agents, customers, officers or competitors) any proprietary or confidential information of TMC ("Confidential Information") which ISA may receive or acquire in connection with TMC Products or in the course of ISA's activities under this Agreement; provided that ISA may disclose Confidential Information to those of ISA's Associates who: (1) in order to carry out ISA's obligations under this Agreement specifically require such information; (2) have been advised by ISA of the confidentiality obligations with respect to such Confidential Information; and (3) have signed confidentiality agreements containing covenants substantially similar to the provisions of this Section 11. ISA shall provide a fully-executed copy of any such agreement to TMC upon request.
>
> 11.2. ISA shall take all precautions necessary to prevent any unauthorized disclosure of any Confidential Information.
>
> 11.3. ISA's obligation to maintain Confidential Information in confidence shall survive indefinitely following the expiration or termination of this Agreement.

11.4. This Agreement and the terms contained herein shall be deemed confidential and subject to the provisions of this Section 11.

11.5. ISA agrees that, in the event of any breach or threatened breach by ISA or any of its Associates of its obligations under this Section 11, TMC shall have the right to injunctive relief as set forth in Section 16 below.

28. Section 12 of the Agreement provides the following non-compete clause:

During the term of this Agreement and for a period of twelve (12) months following its expiration or termination by either Party, each of ISA and Guarantor agrees not to manufacture, represent, distribute, facilitate, sell or promote products that compete with TMC Products (a competitive product shall include, but not be limited to, any product that is used in any procedure, or used to treat any condition or deformity, the same or similar to that for which a TMC Product can be used, such as, for example, any product used to treat bunions); provided, however, that ISA and Guarantor may continue to represent, distribute, facilitate, sell or promote products distributed by the companies listed in Exhibit E but only if such representation, distribution, sale or promotion does not violate this Section 12 or any other provision of this Agreement including, without limitation, Section 7.2(b). [2]

29. Section 14 of the Agreement provides, in relevant part:

14.2. Upon termination due to breach of this Agreement, including without limitation those set forth in Section 14.1, all rights in TMC Product and/or Territory revert to TMC and ISA is required to return all such product to TMC.

14.3. Upon termination for any reason, ISA shall:

    a. Within 10 days of termination return to TMC all consigned TMC Product inventory under the control of ISA or any of its Associates, and all samples and literature relating to TMC Products in packaging suitable to TMC. TMC Product consigned to ISA (excluding any customer consigned product) but not returned to TMC within 10 days will be billed to ISA's final commission statement at fifty percent (50%) of list price minus commissions. In the event that ISA's final commission statement shows a negative balance and that ISA owes TMC for

---

[2] No companies are listed under Exhibit E of the Agreement.

consigned TMC Product inventory and/or other items or materials not returned, then ISA will be invoiced for the variance. Payment by ISA will be due within 30 days of invoice.

   b. Within 10 days of termination return all tangible representations or embodiments of the Intellectual Property and the TMC Marks to TMC and immediately and permanently discontinue all use of the Intellectual Property and the TMC Marks.

   c. Immediately return or destroy, at TMC's sole option and request, any Confidential Information received in tangible form and all copies thereof.

14.4.   Upon termination for any reason, ISA shall not:

   a. Remove consigned inventory from any facility with a signed facility consignment agreement, unless requested otherwise in writing by TMC.

   b. Sell or invoice any Customer for any TMC Product(s), unless requested otherwise in writing by TMC.

   c. Provide any TMC inventory, samples, or literature to anyone other than TMC.

30.   The restrictive covenants in the Agreement are reasonably necessary to protect certain legitimate business interests of Treace, including, but not limited to, the following: (1) Treace's substantial relationships with specific prospective and existing customers and patients; (2) Treace's trade secrets; (3) Treace's valuable confidential business information that otherwise does not qualify as a trade secret under section 688.002, Florida Statutes; (4) Treace's customer and patient goodwill associated with its Lapiplasty® 3D Bunion Correction™ procedure and ongoing business operations, by way its registered trademarks and patents, in the geographic areas in which its products are sold, as well as in the specific marketing and trade area of surgical

management of bunion deformities and related midfoot correction; and (5) the extraordinary and/or specialized training that Treace provides to its independent sales agents and qualified surgeons.

31. Crimson Biomed and Urquiza terminated the Agreement effective June 28, 2022. As result of the termination of the Agreement, Crimson Biomed and Urquiza are no longer independent sales agents of Treace. However the various restrictive covenants intended for the protection of Treace cited above continue to apply as post-termination obligations and covenants under the Agreement.

32. Since terminating the Agreement, Urquiza has become employed by Fusion Orthopedics, LLC ("Fusion"). Fusion is one of Treace's primary competitors. Fusion markets and sells the LapiLock 4D Bunion Correction System ("LapiLock system"), which directly competes with Treace's Lapiplasty® procedure and related products. Fusion and Treace share the same target market for the sale of their respective products.

33. Due to the commercial success of Treace's Lapiplasty® procedure, other medical device companies like Fusion are seeking to capitalize on Treace's pioneering technology, Treace's impressive clinical data and Treace's commercial achievements for their own financial gain. Specifically, Fusion has infringed Treace's patent, trademark and copyright rights through its LapiLock system. Treace has filed suit against Fusion in the United States District Court, District of Arizona, case number 2:22-cv-00490-SRB, alleging various claims for patent infringement, trademark infringement, copyright infringement, common law unfair competition, and unfair

competition under 15 U.S.C. § 1125. This lawsuit is ongoing as of the date of this filing.

34. Fusion's LapiLock mark is confusingly similar to Treace's federally registered Lapiplasty® mark. Fusion's use of the confusingly similar LapiLock mark to identify its bunion correction products and methods of their use is likely to create confusion, deception, and mistake by creating the false and misleading impression that Fusion's LapiLock system and related products are manufactured by Treace, distributed by Treace, are associated or connected with Treace, or have the sponsorship, endorsement or approval of Treace.

35. On information and belief, Fusion has surgeons who are trained in performing the Lapiplasty® procedure as customers for its LapiLock system. By targeting trained Lapiplasty® procedure surgeons, Fusion avoids the substantial cost inherent in converting surgeons who perform traditional bunion surgery to a new technique and then ensuring that these surgeons perform the new technique correctly.

36. On information and belief, surgeons led to believe that Fusion's LapiLock System will produce the consistently positive results that they achieve with Treace's Lapiplasty® procedure have instead experienced inconsistent results with Fusion's LapiLock System, including failure of bones to fuse post-surgery.

37. On information and belief, patients experiencing poor outcomes with Fusion's LapiLock System are unlikely to distinguish between Fusion's surgical method and system and Treace's surgical method and system. On information and belief, these patients are, however, likely to tell their friends and colleagues about their

dissatisfaction with the "latest" surgical technique for treating bunions. On information and belief, this bad "word of mouth" taints Treace's Lapiplasty® procedure in the minds of prospective patients. On information and belief, this bad "word of mouth" can also cause prospective patients who would otherwise be helped through surgery with Treace's Lapiplasty® procedure to unnecessarily forego care and endure great pain and ongoing disfigurement.

38. Fusion's actions are causing injury to Treace's business, goodwill and reputation.

39. Fusion has been hiring and attempting to hire Treace's independent sales representatives to promote and sell Fusion's LapiLock System to Treace's customers and potential customers. Urquiza is one such sales representative that Fusion hired. By hiring Treace's independent sales agents, like Urquiza, Fusion similarly avoids the substantial and inherent costs of training their sales agents on bunion deformities and corrective techniques. These former sales agents of Treace are able to readily discuss and compare the Lapiplasty® and LapiLock products. These sales agents have intimate knowledge of Treace's customers, products, and operations, which they can exploit in furtherance of Fusion's interests.

40. Urquiza's title with Fusion is "Midwest Regional Director of Education."

41. On September 15, 2022, Treace sent a letter to Urquiza and Crimson Biomed outlining their respective obligations under the Agreement. Urquiza acknowledged receipt of this letter on September 29, 2022.

42. Urquiza is clearly aware of his obligations under the Agreement. Notwithstanding, Urquiza is continuing to breach the Agreement's restrictive covenants through his employment with Fusion.

43. Urquiza recently attended the American Orthopaedic Foot & Ankle Society Annual Meeting in Quebec City, Canada from September 14 – 17, 2022. Urquiza attended the meeting as a Fusion representative promoting Fusion's LapiLock system to various customers and prospective customers nationwide.

44. Urquiza has breached Section 11 of the Agreement. On information and belief, Urquiza has disclosed Treace's confidential information to Fusion and has used Treace's confidential information in furtherance of his activities as a Fusion employee in competition with Treace.

45. Urquiza has breached the non-competition provision in Section 12 of the Agreement through his employment with Fusion. Though his employment with Fusion, Urquiza currently represents, facilitates, promotes, and/or sells Fusion's LapiLock system, a directly competitive product to Treace's Lapiplasty® procedure and related products, in direct violation of the Agreement.

46. Lastly, Urquiza has breached Section 14 of the Agreement. Upon Crimson Biomed's termination of the Agreement, Urquiza failed to immediately return or destroy Treace's confidential information.

47. In sum, though his employment with Fusion, Urquiza has or threatens to utilize Treace's confidential information in competition with Treace, do business with Treace's specific prospective and existing customers with whom he developed a

relationship with pursuant to his former association with Treace, employ the specific and specialized training that he was provided by Treace in competition with Treace, and misappropriate Treace's established customer and patient goodwill for the benefit of Fusion.

48. Fusion's employment of Urquiza is part of Fusion's larger scheme to hire Treace's sales agents for purposes of wrongfully exploiting the agents' intimate knowledge of Treace's products and business, customer relationships, specialized training, and customer and patient goodwill in an effort to expand Fusion's share in the bunion correction market.

## COUNT I – BREACH OF CONTRACT

49. Treace incorporates by reference the allegations contained in paragraphs 1 – 48 above.

50. The Agreement is a valid contract.

51. Urquiza's material breach of the restrictive covenants found in Sections 11, 12, and 14 of the Agreement has or threatens to cause damages to Treace, including, but not limited to, loss of business and profits, damage to its relationships with existing and prospective customers, loss and/or misappropriation of its confidential information, and damage to its customer and patient goodwill. These injuries are certain to continue into the future if Urquiza is not enjoined.

52. Treace has no adequate remedy at law to protect its legitimate business interests because monetary damages alone will not adequately compensate Treace for all aspects of Urquiza's violation of the Agreement's restrictive covenants. Urquiza's

breach of the restrictive covenants will result in continued and compounding injury to Treace if Urquiza is not enjoined.

53. Injunctive relief is necessary to prevent the irreparable injury that Treace will suffer as a result of Urquiza's violations of the restrictive covenants in the Agreement via the means outlined above.

54. Pursuant to section 542.335(1)(j), Florida Statutes, "[a] court shall enforce a restrictive covenant by any appropriate and effective remedy, including, but not limited to, temporary and permanent injunctions.

WHEREFORE, Treace demands judgment against Urquiza for damages, a permanent injunction prohibiting Urquiza from engaging in any activity that would violate the restrictive covenants of the Agreement, interest, costs, attorneys' fees, and other relief as the Court determines appropriate.[3]

### DEMAND FOR JURY TRIAL

Treace demands a trial by jury for all issues so triable.

Dated this 6th day of October 2022.

ALEXANDER DEGANCE BARNETT P.A.

By: /s/ Todd A. Wright
Michelle Bedoya Barnett
Florida Bar No. 0823201
Todd A. Wright
Florida Bar No. 0071246
E-mail: todd.wright@adblegal.com
Chandler Jolly

---

[3] By motion, Treace will additionally seek preliminary injunctive relief.

            Florida Bar No. 1018597
            E-mail: chandler.jolly@adblegal.com
            E-mail: mailbox@adblegal.com
            1500 Riverside Avenue
            Jacksonville, FL 32204
            (904) 345-3277 Telephone
            (904) 345-3294 Facsimile

            *Attorneys for Plaintiff*